**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

SYNTHES, INC., et al.,

*Plaintiffs,*

v.

DANIEL GREGORIS

*Defendant.*

CIVIL ACTION
NO. 16-06255

**PAPPERT, J.**                                         **January 9, 2017**

<u>**MEMORANDUM**</u>

DePuy Synthes Sales, Inc., DePuy Orthopaedics, Inc. and Synthes, Inc. (collectively "Synthes") sells medical implants and related products in a number of categories, including trauma. Globus, Inc., another medical device company, already competes with Synthes in the spine category. It is now entering the trauma market and will compete directly with Synthes in that area as well. Globus was founded in 2003 by two former high-ranking Synthes employees and the companies have been competitors in the marketplace and combatants in the courtroom ever since.

Daniel Gregoris was a long-time Synthes employee who for many years served as an area vice president, reporting directly to the company's eastern vice president of sales. He left Synthes on October 31, 2016 to become the national head of sales for Globus's new trauma division. In 2014, however, Gregoris signed an employment agreement with Synthes. Part of that agreement prohibits Gregoris from, among other things, disclosing or using confidential Synthes information to which he had access if that information could disadvantage Synthes or

1

advantage any Synthes competitor.  The prohibition applies for eighteen months to any position in any location.

Synthes seeks a preliminary injunction and to hold Gregoris to the terms of his 2014 contract.  After thorough review of all the documentary evidence and careful consideration of the testimony throughout a three-day hearing, the Court grants Synthes's motion.  Synthes has clearly shown an imminent risk that in his new position Gregoris will disclose or use confidential Synthes information which could disadvantage Synthes or advantage Globus.  Synthes has accordingly met the heavy burden required to obtain the extraordinary remedy it seeks.

## I.

### A.

Synthes grew from an affiliation of surgeons in Switzerland called the "AO" that wished to improve care for trauma patients in 1958.  (Pl.'s Ex. 106.)  Synthes designs, manufactures, markets and sells medical implants and instruments across several broad categories including joint reconstruction, trauma, spine, sports medicine and power tools.  (Hrg. Tr., at 14:14–15:25; 25:18–26:16 (Gregoris Test.), ECF No. 31 (hereinafter "Hrg. Tr. 1").)  Synthes is the global market leader in orthopedic trauma products, which include implants and instruments used for surgical treatment of fractures, deformities and tumor diseases of long bones.  (Pl.'s Ex. 1.) Synthes sells these products to a range of customers, key among them hospitals and surgeons.  (Verified Compl. ¶¶ 23 & 24; Pl.'s Ex. 1.)

Synthes's sales force is composed primarily of an extensive network of sales consultants around the country.  Each sales consultant is responsible for driving sales by engaging in "direct customer service to the customer at the front line."  (Hrg. Tr. 1, at 17:8–9 (Gregoris Test.).)  A sales consultant is responsible for a discrete territory—for example, a group of hospitals in a

specific city.  (*Id.*, at 17:1–9 (Gregoris Test.); Pl.'s Ex. 31A (sealed).)  Sales consultants report

directly to one of approximately 100 regional managers.  (*Id.* at 17:2–4; Hrg. Tr., at 22:13–16

(Gonzalez Test.), ECF No. 33 (hereinafter "Hrg. Tr. 2").)  Each regional manager reports to one

of sixteen Area Vice Presidents ("AVPs").  (Pl.'s Ex. 31A (sealed); Hrg. Tr. 2, 12:4 (Gonzalez

Test.).)  The AVPs manage "areas" that range from a single state, such as New York, to a region

of states, such as the northwest.  (Pl.'s Ex. 31A (sealed).)  AVPs report to one of two vice

presidents of sales (one in the eastern region of the country and one in the west) who in turn

report directly to the president of Synthes.

   AVPs are responsible for "leading the overall management of sales strategies, activities,

operations, and budgets associated with driving sales for the organization."  (Pl.'s Ex. 9, at

1.)  AVPs must accordingly engage, manage and develop regional managers and lead the overall

implementation of sales strategies and operations; they are also expected to forge and maintain

relationships with key opinion leaders within their assigned geographic area.  (*Id.*)

   While AVPs are responsible for defined areas, they do not work in a vacuum.  (Hrg. Tr.

1, at 49:13–15 (Gregoris Test.).)  Their duties necessarily entail executing Synthes's nationwide

sales plans within their assigned regions.  An AVP therefore cannot do his or her job without

knowing these national strategies and initiatives.  (Hrg. Tr. 2, at 133:15–18 (Carpenter

Test.).)  To that end, the AVPs work together on a regular basis.  Along with the two vice

presidents of sales, the AVPs make up the sales leadership team for Synthes.  (*Id.* at 131:24–

132:6.)  The team has weekly telephone calls, in addition to *ad hoc* calls and in-person meetings,

during which the group discusses Synthes's strategic initiatives and national sales

information.  (*Id.* at 132:23–133:2.)  In addition to these meetings, the AVPs also work together

to develop Synthes's annual business plan.  *See* (*id.* at 168:1–4).  Lastly, AVPs occasionally

attend national pricing committee meetings on behalf of the vice presidents of sales.  (*Id.* at 107:17–108:4 (Gregoris Test.); Pl.'s Ex. 39 (sealed).)  At these meetings, the pricing committee makes exceptions to established Synthes pricing matrices.  (Hrg. Tr. 1, at 107:17–108:4; 103:18–25; Pl's Ex. 37a (sealed).)

Consistent with their leadership positions and overall company responsibilities, AVPs have access to and receive an extensive amount of confidential information, including national sales strategies, nationwide pricing information, national sales numbers with analysis and commentary, forecasts, growth plans, market strengths and weaknesses, information about confidential products still in development and sales consultant rankings.  (Pl's Ex. 33A (sealed); Hrg. Tr. 2, at 134:1–135:8 (Carpenter Test.); Verified Compl. ¶ 6.)  Strategies for optimizing the sales force in addition to information about other confidential projects and initiatives within the company are also shared with the AVPs.  (Hrg. Tr. 2, at 134:21–135:4 (Carpenter Test.).)

## B.

Synthes hired Daniel Gregoris as a trauma sales consultant in August 1996.  (Hrg. Tr. 1, at 41:9 (Gregoris Test.); Decl. of Daniel Gregoris, ("Gregoris Decl.") ¶ 3, ECF No. 12-1.)  Over the next twenty years, Gregoris worked his way up through the company.  In 2006 Synthes promoted Gregoris to regional manager.  (Hrg. Tr. 1, at 42:13–16 (Gregoris Test.).)  In 2008 Synthes promoted Gregoris again, this time to AVP of the northeast region, an area that included New York and New England.[1]  (Verified Compl. ¶ 32; Hrg. Tr. 1, at 44:1–4 (Gregoris Test.).)  Gregoris worked as AVP for the northeast until May of 2016, when Synthes made him its director of commercial integration.  (Gregoris Decl. ¶ 55.)  In that role, Gregoris was no

---

[1]     Synthes has since redrawn its geographic boundaries such that there is no longer a "northeast" region.  There are now two regions—New York and New England—led by two AVPs in what was once the northeast.  (Pl.'s Ex. 57 (sealed).)

longer responsible only for sales; instead, he helped to integrate a recently acquired company, Bio Medical Enterprises ("BME"), into Synthes.  (*Id.* ¶ 13.)

Gregoris neither sought nor wanted the commercial integration position.  Rather, his new job title was the product of an ultimatum given to him by his manager, Vice President of Sales Ken Carpenter, following a Synthes corporate reorganization.  (Hrg. Tr. 1, at 217:9–218:18 (Gregoris Test.).)  After the reorganization, there were only sixteen positions available for the then-nineteen AVPs.  (Hrg. Tr. 2, at 12:3–4 (Gonzalez Test.).)  Synthes did not select Gregoris for one of the available AVP positions.  (*Id.* at 11:15–22.)  It offered him the BME position instead, while asking him to continue as AVP of New York on an interim basis until the already-selected permanent hire, Bassel Rifai, could assume the role.  (Hrg. Tr. 1, at 224: 22–226:15 (Gregoris Test.); Gregoris Decl. ¶ 57.)  The choice for Gregoris was clear: take the BME position or face termination.  (Gregoris Decl. ¶¶ 55 & 56.)

In September 2016 Synthes offered Gregoris the AVP of New York position on a permanent basis because of his success with the BME integration and Synthes's decision to place Rifai into a different position.  (Hrg. Tr. 1, at 226:24–227:2 (Gregoris Test.); Verified Compl. ¶ 47.)  Gregoris verbally accepted the position but did not sign a new employment agreement.

At least in part due to the changes in his duties and a purported concern for his future at Synthes, Gregoris began speaking with Globus about taking a position as vice president of sales for its trauma division.  Until recently, Globus has largely focused on manufacturing musculoskeletal implants for spine surgery.  (Decl. of David Demski, ("Demski Decl."), ¶ 3, ECF No. 12-2.)  The company has developed a comprehensive portfolio of over 140 spine products and an international distribution network through which to sell them.  (Pl.'s Ex. 4, at 4.)

Globus is now, however, "in the very early stages of . . . entering the trauma market" and is developing a "comprehensive bag" of products for use in trauma surgeries. (Demski Decl. ¶¶ 3 & 4.) The company has "aspirations to one day become a significant player in the trauma market with the ability to compete with market leaders," including Synthes. (*Id.* ¶ 5.) Globus currently has two trauma products under FDA review and anticipates submitting seven more within the next year. (Hrg. Tr., at 13:9–18 (Demski Test.), ECF No. 35 (hereinafter "Hrg. Tr. 3").) Globus anticipates FDA approval on its first two products in the spring of 2017 with the remaining products to follow later in the year. (*Id.* at 13:13–18.; Demski Decl. ¶ 4.)

While Globus awaits regulatory approval of its initial trauma products, it intends to develop a national salesforce capable of selling devices as soon as the FDA permits. Globus anticipates hiring twenty-two sales representatives this year to begin selling products in the third quarter of 2017. (Hrg. Tr. 3, at 13:15–22 (Demski Test.); Demski Decl. ¶ 7.) Globus has a sales goal of $2.3 million in 2017 for this new line of products. (Hrg. Tr. 3, at 16:13–15 (Demski Test.).)

Globus accordingly needed an experienced executive who could recruit a sales force and help launch its new trauma division and Gregoris, based largely on his work for Synthes, fit the bill. In June 2016, Gregoris and Globus began discussing the possibility of Gregoris leaving Synthes for Globus. (Pl.'s Ex. 22.) Gregoris interviewed and met with Globus executives and personnel on at least three occasions: June 28, (Pl.'s Ex. 123 (sealed)); August 9, (Pl.'s Ex. 126 (sealed)); and August 25, (Pl.'s Ex. 128 (sealed)). Globus offered Gregoris the job on August 25. (Pl's Ex. 25. (sealed).) Negotiations between the parties, including Gregoris's personal attorney, continued for several months and by October 5 Gregoris was in the final stages of accepting the Globus offer and was planning to leave Synthes. (Pl.'s Ex. 27 (sealed); Pl.'s Ex.

6

130 (sealed).)  He received an updated offer letter from Globus on October 24, (Pl.'s Ex. 28

(sealed)), which he signed on October 27.   He resigned from Synthes on October 31.  (*Id.*;

Verified Compl., ¶ 91).  As Vice President of Sales, Trauma for Globus, Gregoris will be

"responsible for the development and execution of all domestic sales strategies and activities

within [Globus's] trauma business unit."  (Def.'s Ex. 25.)  Gregoris will need to recruit a

salesforce, make necessary promotions, and "orchestrate a market launch of a [trauma] product

platform" for Globus.  *Id.*

## C.

Over the course of his Synthes career, Gregoris signed several employment

agreements.  *See, e.g.*, (Pl.'s Exs. 5, 6 & 178).  The most recent of which, the Employee Secrecy,

Intellectual Property, Non-Competition and Non-Solicitation Agreement ("the Agreement"),

Gregoris signed on March 27, 2014.  *See* (Pl.'s Ex. 5).  The Agreement includes the following

provisions and definitions primarily at issue here; notably the Agreement's restrictive covenant:

> [D]uring your employment with any COMPANY and for a period of
> eighteen (18) months after the termination of your employment (whether
> voluntary or involuntary), **you will not, directly or indirectly, perform,
> or assist others to perform, work for any COMPETITOR in any
> position in any location in which you could disadvantage [Synthes]
> or advantage the COMPETITOR by: (a) your disclosure or use of
> CONFIDENTIAL INFORMATION to which you had access;** (b)
> your use of the specialized training provided to you by your
> EMPLOYER or any COMPANY for which you have worked; and/or (c)
> your use of CUSTOMER relationships and goodwill.

(*Id.* at 3, ¶ 6 (emphasis added).)  "Confidential Information" is defined as information about

Synthes's business "not generally known to the trade or industry in which [Synthes] is engaged,

which is disclosed to you or known by you as a result of your employment by [Synthes]."  (*Id.* at

1.)  Confidential information includes, among many other things, strategies, operations, business

planning and development, pricing, training, sales volumes, performance reviews, compensation

and rankings not publically known and disclosed in connection with employment by Synthes.

(*Id.*)

The Agreement defines "competitor" as:

> [A]ny person or entity including, but not limited to, you or anyone acting on your behalf, (a) that is **engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with, or can be substituted for, a product, process, technology, machine, invention, or service of any COMPANY that is in existence or under development; (b) that could benefit from (i) CONFIDENTIAL INFORMATION;** (ii) your use of the specialized training provided to you by your EMPLOYER or any COMPANY; and/or (c) that could benefit from your use of the COMPANY's customer relationships and/or goodwill.

(*Id.* at 2 (emphasis added).) The Agreement also contains specific limitations on solicitation:

> [Y]ou agree that during your employment and for eighteen (18) months after the termination of your employment (whether voluntary or involuntary) with the COMPANY, you shall not, directly or indirectly, contact, call upon, solicit business from, sell to, or render services to, or assist others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any CUSTOMER: (a) in connection with the sale, support, service or use of any product or service that resembles or competes with or that may be substituted for one that is being sold, under development or acquired by any COMPANY; (b) if you are working with, for, or as a COMPETITOR of any COMPANY; and/or (c) if your activities could damage or interfere with the CUSTOMER relationships of any COMPANY or divert business from such CUSTOMERS to a COMPETITOR. . . .

(*Id.* at 3, ¶ 7.) Finally, the Agreement provides:

> [Y]ou agree that for a period of twelve (12) months after your last date of employment within the COMPANY, you will not, directly or indirectly, on your own behalf or on behalf of others, solicit, recruit, interview, hire, identify, suggest or comment on any individual employed by any COMPANY to leave his or her employment with the COMPANY. . . .

(*Id.* at 3, ¶ 8.)

## II.

Synthes contends that Gregoris cannot serve in his new position at Globus without violating the Agreement and causing immediate and irreparable harm to Synthes.  Gregoris does not dispute that Globus and Synthes are competitors, nor does he contest the restrictive covenant's geographical or temporal scope, *per se*.  He instead argues that the Court should only enforce the restrictive covenant in his former Synthes northeast area.  He then claims his role at Globus will not, for at least the first eighteen months of his employ there, allow him to advantage Globus or disadvantage Synthes through the use of any confidential information, specialized training, customer relationships or goodwill he acquired or developed while at Synthes because Globus plans to restrict his activities and responsibilities to areas outside of the northeast region.  *See* (Def.'s Resp., at 4–5, ECF No. 12).

Synthes filed a verified complaint, (ECF No. 1), along with a motion for a temporary restraining order and preliminary injunction on December 1, 2016, noting that Gregoris's start date at Globus was December 5, 2016, (ECF No. 3).  The Court held a status conference with counsel for the parties on December 2, 2016, (ECF No. 11).  All agreed at that time that Gregoris would not begin work at Globus until Synthes's motion was adjudicated.  The Court held an evidentiary hearing over three days, December 15, 16 and 19, 2016.  (ECF No. 10).

Federal Rule of Civil Procedure 65 authorizes courts to issue preliminary injunctions.  Injunctive relief is "an extraordinary remedy," which the Court may grant only "upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Ctr.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  A party seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of the preliminary injunction; (3) "that the

balance of equities tips in [their] favor"; and (4) that an injunction is in the public interest. *Id.* at 20; *see also Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014).  The movant bears the burden of proving each of these elements, *Ferring Pharms.*, 765 F.3d at 210 (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990)), and the "failure to establish any element renders a preliminary injunction inappropriate," *id.* (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)).  Although the plaintiff need not prove their case with "airtight certainty," the moving party nevertheless "bears a heavy burden on a motion for a preliminary injunction." *Punnett v. Carter*, 621 F.2d 578, 588 (3d Cir. 1980).

### III.

The parties agree that New Jersey law governs the interpretation of the Agreement, and the Agreement contains a choice-of-law clause stating that New Jersey law governs its application and interpretation. *See* (Pl.'s Ex. 5, at 6.)  The Court must apply Pennsylvania's choice-of-law rules. *See Klaxon v. Stentor Mfg. Co.*, 313 U.S. 478 (1941).  Pennsylvania applies Second Restatement of Conflict of Laws to a choice-of-law provision. *See, e.g.*, *Synthes USA Sales, LLC v. Harrison*, 83 A.3d 242, 247 (Pa. Super. Ct. 2013).  Under the Second Restatement, a choice-of-law clause will be enforced unless either: (1) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice; or (2) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.  Restatement (Second) of Conflict of Laws § 182(2) (1988); *see also Harrison*, 83 A.3d at 247.  Applying New Jersey law does not run counter to

10

Pennsylvania public policy.  *See, e.g.*, *Smith v. Commonwealth Nat'l Bank*, 384 557 A.2d 775, 777 (Pa. Super. Ct. 1989) ("Choice of law provisions in contracts will generally be given effect.").  Moreover, there is a reasonable basis for applying New Jersey law: Synthes has significant and ongoing business contacts with that state.

While New Jersey law governs the applicable contract provisions, the Court must apply a federal standard to determine whether to grant a preliminary injunction.  *See Sys. Operations, Inc. v. Sci. Games Dev. Co.*, 555 F.2d 1131, 1141 (3d Cir. 1977) ("Although the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions.").

## IV.

### A.

As an initial matter, the Agreement's restrictive covenant is valid and enforceable under New Jersey law.  New Jersey courts will generally enforce a covenant not to compete "if it is reasonable under all the circumstances of [the] particular case."  *Whitmyer Bros., Inc. v. Doyle*, 274 A.2d 577, 581 (N.J. 1971).  A reasonable covenant (1) protects the legitimate interest of the employer; (2) imposes no undue hardship on the employee; and (3) is not injurious to the public.  *Id.*  "To minimize the hardship imposed on the employee, the geographic, temporal and subject-matter restrictions of an otherwise enforceable agreement not to compete will be enforced only to the extent reasonably necessary to protect the employer's legitimate business interests."  *Campbell Soup Co. v. Desatnick*, 58 F. Supp. 2d 477, 489 (D.N.J. 1999) (citing *Coskey's Television & Radio Sales & Serv., Inc. v. Foti*, 602 A.2d 789 (N.J. App. Div. 1992)); *see also Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884, 897 (N.J. 2005) ("Each of those factors

11

must be narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests.").

**1.**

Employers have a legitimate business interest in protecting trade secrets and confidential information. *Campbell Soup Co.*, 58 F. Supp. 2d 477, 489 (D.N.J. 1999) (citing *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879 (1988)).  Not all information generated in the course of business, however, justifies enforcing a covenant not to compete.  Employers have a legitimate interest in protecting "highly specialized, current information not generally known in the industry, created and stimulated by the . . . environment furnished by the employer, to which an employee has been exposed and enriched solely due to his employment."  *Id.* (internal quotations omitted).  Simply defeating competition from experienced former employees is not a legitimate business interest, however.  *See Ingersoll-Rand*, 542 A.2d at 892 (noting that courts will not enforce a covenant not to compete "merely to aid the employer in extinguishing competition, albeit competition from a former employee").

Distinguishing legitimate and illegitimate interests can be a difficult task.  While the employer has an interest in protecting its confidential information, the skills, expertise and know-how cultivated in the course of employment are not readily separated from the former employee's person.  *Id.* at 892.  An employee therefore remains free to put his expertise to use "in any business or profession he may choose, including a competitive business with his former employer."  *Campbell Soup. Co.*, 58 F. Supp. 2d at 489 (citing *Ingersoll-Rand*, 542 A.2d 879).

Employers also have a legitimate interest in protecting their customer relations.  *See Ingersoll-Rand*, 542 A.2d at 888 (noting that the New Jersey Supreme Court has "recognize[d] as legitimate the employer's interest in protecting trade secrets, confidential information, and

customer relations").  This interest extends to protecting the identities of customers when those identities are disclosed in confidence to a key employee and that employee is party to a covenant not to compete.  *See Lamorte Burns & Co. v. Walters*, 770 A.2d 1158, 1166 (N.J. 2001). With these legitimate business interests in mind, "courts must evaluate the reasonableness of a restrictive covenant in light of the individual circumstances of the employer and employee and balance the employer's need for protection and the hardship on the employee that may result."  *Campbell Soup Co*, 58 F. Supp. 2d at 489. (quoting *Ingersoll-Rand*, 542 A.2d 879 (internal quotation marks omitted)).

Considering all of the circumstances in this case, Synthes has a legitimate business interest in enforcing the restrictive covenant to which Gregoris agreed.  Gregoris acknowledged that Synthes relies on a large amount of trade secrets and confidential information to do business and that the purpose of the non-disclosure and non-compete agreement is to protect against its disclosure.  (Hrg. Tr. 1, at 67:4–14 (Gregoris Test.).)  The parties do not dispute that Gregoris had extensive access to, and received a substantial amount of, confidential information as a Synthes AVP.  *See also infra* Section IV.B (describing the extent of Gregoris's exposure to confidential information).

## 2.

Enforcing the restrictive covenant will not subject Gregoris to undue hardship.  The covenant's (1) duration, (2) geographic scope and (3) scope of prohibited activities guide whether its application would be unreasonable.  *See, e.g.*, *Trico Equip., Inc. v. Manor*, No. 08-5561, 2009 WL 1687391, at *7 (D.N.J. June 15, 2009) (citing *Maw v. Advanced Clinical Comm'cns, Inc.*, 820 A.2d 105, 115 (N.J. Super. Ct. App. Div. 2003)), *rev'd on other grounds*, 846 A.2d 604 (N.J. 2004); *More*, 869 A.2d at 897.  The covenant must be narrowly tailored in

13

each respect so as to ensure that it is "no broader than necessary to protect the employer's interests." *More*, 621 F. Supp. 2d at 224.

Courts are less likely to find an undue hardship where the employee terminated the employment relationship. In those cases, the employee "put himself or herself in the position of bringing the restriction into play." *Id.* at 898. However, at least one court outside this Circuit has noted that "it would be inequitable to penalize an employee when he decides to leave based on reasonable uncertainty about future job security." *See, e.g.*, *Marinelli v. Medco Health Sols., Inc.*, 951 F. Supp. 2d 303, 322 (D. Conn. 2013). Gregoris contends that he viewed his position at Synthes as less than secure, that this is why he left the company for Globus and that the Court should, consistent with *Marinelli*, not "penalize" him for doing so.

In 2016 Synthes shifted Gregoris from AVP for the northeast to director of commercial integration, a non-sales position. It later moved him back to a (newly created) AVP position encompassing only New York State. *See supra* Part I. Gregoris's duties as director of commercial integration and AVP, New York were initially temporary—at the conclusion of the AVP, New York role Gregoris was to be given the opportunity to take his severance package or interview for other positions at the company. (Hrg. Tr. 2, at 10:17–22 (Gonzalez Test.); Def.'s Ex. 21). Gregoris claims that his concerns over his future at Globus reached their peak following a conversation with Synthes's President, Juan-Jose Gonzalez, at an Orthopedic Trauma Association meeting. *See* (Hrg. Tr. 1, at 236:1–237:4 (Gregoris Test.); Gregoris Decl. ¶ 70). At that event, Gonzalez spoke to Gregoris and attempted to put a positive spin on his varying job titles and responsibilities. Gonzalez told Gregoris that the move to AVP for New York was an "opportunity to prove yourself." (Gregoris Decl., ¶ 69.) Gregoris expected that the previous twenty years with the company had proven his worth. He claims Gonzalez's comment sent him

"into panic-mode" about his future with the company.  (*Id.* at ¶ 70.)  According to Gregoris, it was not until this conversation with Gonzalez that he finalized his decision to leave Synthes and "turned [his] head to Globus."  (Hrg. Tr. 1, at 231:7–21 (Gregoris Test.)).

While Gregoris could have been reasonably uncertain about his job security at Synthes, that uncertainty does not dictate the Court's undue burden analysis.  *Marinelli* suggests that courts should not penalize employees for quitting their jobs if they are "reasonab[ly] uncertain[]" about their future employment there; it does not guarantee a finding of an undue burden in such a situation.  Holding Gregoris to the terms of his restrictive covenant would not cause him undue hardship under any standard.  Under the Agreement, Synthes was obligated to pay Gregoris his base salary if he was terminated for any reason other than misconduct.  (Pl.'s Ex. 5, ¶ 10; Hrg. Tr. 1, at 185:16–24 (Gregoris Test.).)  Moreover, Synthes agreed to "extend [Gregoris] the protection of the addendum to his [Synthes employment] agreement[,] providing base pay if he cannot find another job during the period of injunction."  (Pl.'s Resp., at 2.)  Most importantly, Globus agreed to pay Gregoris $475,000 for the first two years of his employment if Synthes successfully enforces the restrictive covenant.[2]  (Pl.'s Ex. 28 (sealed).)  Had Gregoris remained at Synthes and been fired as part of a reorganization, his salary was guaranteed; if he is enjoined from accepting his new position with Globus until the restrictive covenant expires, he will be highly compensated by Globus in the interim.  The concerns contemplated in *Marinelli* are absent here—Gregoris, to his and his attorney's credit, negotiated any uncertainty away.

Gregoris does not claim that the duration of the restrictive covenant is unreasonable and, in any event, it is not.  New Jersey courts have upheld covenants not to compete where the duration was an appropriate period of time for the former employer to replace and train a

---

[2]     While this information is contained in a sealed exhibit, there has been no good cause shown to keep it secret and it is important to the Court's undue burden analysis and calculation of the amount of the bond.  *See also infra* Part V.

replacement for the departing employee.  *See, e.g.*, *More*, 869 A.2d at 898 ("On its face two years appears to be a reasonable period for [the plaintiff] to replace and retrain a person to assume [the Defendant's] prior role.")  Gregoris served as an AVP at Synthes for approximately eight years, (Verified Compl., ¶ 4), and the position of AVP requires a substantial degree of expertise, *see supra* Part I (detailing Gregoris's job duties as AVP).  Eighteen months is a reasonable period of time for Synthes to recruit and train a replacement for Gregoris and the duration of the covenant not to compete is not unduly burdensome.

Nor does the Agreement's geographic scope render it unduly burdensome.  The covenant's geographic restriction must be reviewed in light of the specific facts of the case at hand.  *See Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 224 (D.N.J. 2009).  Certain employees warrant broader geographic restrictions than others: a wide-ranging covenant not to compete may be reasonable for an employee performing nationwide duties; it would be less reasonable applied to a worker whose work was purely local.  *Cf. Scholastic Funding Grp., LLC v. Kimble*, No. 07-557, 2007 WL 1231795, at *5 (D.N.J. Apr. 24, 2007) (upholding a covenant not to compete despite its "lack of geographic limitation" because the relevant industry (telemarketing) is "broad-ranging in its scope by the nature of its business").  The covenant's unlimited geographic scope does not automatically render it unduly burdensome.   Because Gregoris was a high-level executive familiar with nationwide plans, strategies and information relevant to the medical device sales industry, which is global and broad-ranging by nature, the geographic scope is reasonable.  *See also infra* Section IV.B (discussing in detail the geographic scope of AVP duties).

**3.**

Enforcing covenants not to compete under these facts benefits the public, bringing stability and predictability to business relationships.  *See Ethicon, Inc. v. Angelini*, 2016 U.S. Dist. LEXIS 138085, at *14–15 (M.D. Fla. Sept. 22, 2016).  There is nothing in this record to suggest that enforcing the Agreement would injure the public.  *Cf. id.* (finding enforcement of identical covenant not to compete would not be injurious to the public interest).  Gregoris was a long time, high-ranking and well-compensated Synthes employee and he signed multiple agreements containing restrictive covenants during his time with the company.  *See, e.g.*, (Pl.'s Exs. 5, 6 & 178).  He was aware of the importance of confidential information to a company in this highly competitive industry, and as a result agreed to maintain the confidentiality of that information.  (Hrg. Tr. 1, at 67:4–14 (Gregoris Test.).)  As in *Angelini*, "[i]t cannot be said that the public interest is injured by the enforcement of the Agreement, which would prevent the sacrificing of Plaintiffs' confidential business information to facilitate [Gregoris's]  ambition."  2016 U.S. Dist. LEXIS 138085, at *15.

**B.**

While the Agreement is a valid contract and the covenant not to compete is enforceable, Synthes must still show a likelihood of success on the merits, specifically that Gregoris will breach a term of the Agreement if he serves as Vice President of Sales for Globus's trauma division.   Synthes first cites the Agreement's unambiguous language and notes the national scope of the covenant not to compete.  Next, it argues that Gregoris's work for Globus will inevitably require Gregoris to disclose or use Synthes's confidential information, which will advantage Globus or disadvantage Synthes.  *See* (Verified Compl. ¶ 128); *see also* (Pls. Ex. 5, ¶ 6).

17

Gregoris contends that the Agreement's plain language does not prohibit him from leading the sales efforts of Globus trauma division.  He believes, notwithstanding the Agreement's unambiguous prohibition on his working for a competitor "in any position or in any location," that this provision of the Agreement applies only to the "northeast"—the area where he served as AVP for Synthes from 2008 to 2016.  (Hrg. Tr. 1, at 172:1–3 (Gregoris Test.).)  Gregoris takes this position based on a narrow view of his responsibilities as a Synthes AVP.  He argues that any confidential information he received or had access to in that job was relevant only to his duties within the northeast area and later New York State, and thus could only be used to advantage Globus or disadvantage Synthes if he operated in that same area in his new job, something he will not do for the first eighteen months.

The record evidence overwhelmingly contradicts Gregoris's position, and Synthes has demonstrated a likelihood of success on the merits.  Gregoris did not operate in a silo while AVP for the northeast or New York.  To the contrary, his position gave him unfettered access, over many years, to confidential Synthes's information about the company's national strategies and initiatives, and the position required him to collaborate with other AVPs to implement the national sales strategy.  As vice president of sales for trauma at Globus, Gregoris will be able to disadvantage Synthes and/or advantage Globus through use or disclosure of that confidential information.

### 1.

While AVPs are primarily tasked with driving sales in their designated area, their duties are not neatly delineated like borders on an atlas and the value of the confidential information they acquire is not limited to particular states or regions.  Synthes's Eastern Vice President of Sales Ken Carpenter began his career at Synthes as a sales consultant before becoming a regional

manager and later an AVP.  (Hrg. Tr. 2, at 129:6–22 (Carpenter Test.).)  Carpenter eventually

became one of two vice presidents of sales for Synthes's trauma division.  (*Id.*)  All AVPs in the

Eastern region of the country, including Gregoris, report directly to Carpenter.  *See* (*id.* at

131:11–19).  Because of his similar career trajectory, Carpenter offered extensive insight into the

scope and potential use of the information Gregoris received while an AVP at

Synthes.  Moreover, Carpenter was the most credible witness to testify at the hearing on the

subject of Gregoris's access to and receipt of confidential Synthes information and how that

information could be used by Gregoris to disadvantage Synthes or advantage Globus.

Carpenter testified that while AVPs are of course responsible for sales in their areas,

those responsibilities require collaboration with their counterparts in other areas.  Synthes AVPs

are a part of the company's senior sales leadership team, (*id.* at 131:20–132:6), and in this

capacity, they are tasked with formulating, implementing and executing Synthes's national sales

strategies. They necessarily create, exchange and consider confidential information from across

the country.  (*Id.* at 132:23–133:14.)  While Gregoris testified that any sales strategy or strategic

plan he developed related to the northeast territory, he also conceded that the northeast does not

operate in isolation from the strategies of the company nationwide.  (Hrg. Tr. 1, 49:7–15

(Gregoris Test.).)

Carpenter explained that because the senior sales leadership team must "execute

[Synthes's] national strategies," the team shares and discusses national information "to make

sure that [they are] in alignment across the country and consistent, and that every [AVP] fully

understands what the strategies are, how to implement the strategies, and then how [the AVPs

are] measured against [implementing the strategies]."  (Hrg. Tr. 2, at 133:5–12 (Carpenter

Test.).)  All AVPs participate in a weekly call to discuss product updates, competitive

intelligence, sales and revenue updates and market share and strategy.  (*Id.* at 132:16–17,
132:23–133:14); *see also* (Pl.'s Exs. 32, 37–40, 68–81 (sealed)).  Carpenter testified that during
these calls, AVPs share and discuss "confidential information about the company's strategic
initiatives and national sales information, which apply across the whole footprint" of the
company.  (Hrg. Tr. 2, at 132:23–133:4 (Carpenter Test.).)  He stated that the leadership team
regularly discusses the configuration and pricing of surgical "sets" (kits containing instruments
and implants), (Hrg. Tr., 45:18–20 (Carpenter Test.), ECF No. 34 (hereinafter "Hrg. Tr. 2S")
(sealed)), and the rankings of sales consultants and regional managers, (Hrg. Tr. 2, 135:5–8
(Carpenter Test.).)

Carpenter also shares with the AVPs the "go to market and model for DePuy Synthes,
which includes things like [the] strategy customer book group, and playbook that they have and
how they're to operate with [the] customers," as well as competitive intelligence and pricing
information.  (*Id.* 134:7–13.)  In advance of their meetings, the leadership team receives a
PowerPoint slide deck containing historical snapshots of the customers discussed, details about
the specific value of those customers' inventories and future consignment inventories,
information about emerging competitive threats and proposed courses of action to prevail over
competitors.  *See* (Pl.'s Exs. 37A–40 (sealed); Hrg. Tr. 1, at 104:18–106:25 (Gregoris Test.).)

*     *     *

Gregoris was inundated with information about the company's high-level strategies and
initiatives, its nationwide performance and confidential projects.  It is impossible to overlook the
volume of this information and the regularity with which Gregoris received it: he obtained
weekly sales reports reflecting national sales performance and growth by area and product line,
illustrating performance by region, territory and specific hospital account.  (Verified Compl.

20

¶ 64); *see* (Pl.'s Exs. 31, 31A (sealed)).  He also received monthly sales information, setting forth every territory's projected and actual sales, sales comparisons and rankings, open orders, pricing information and market strengths and weaknesses.  (Verified Compl. ¶ 52.)  Gregoris received regular reports tracking sales of surgical sets in every region of the country, complete with pricing information.  (Hrg. Tr. 1, at 110:1–111:15 (Gregoris Test.); Pl.'s Ex. 41 (sealed).)  He also received monthly rankings of all trauma sales consultants nationwide.  *See* (Pl.'s Exs. 33A, 34–36 (sealed)).  Carpenter explained that AVPs are responsible for familiarizing themselves with all of this information so that they can gather insights from their peers about what methods are effective or ineffective.  *See* (Hrg. Tr. 2, at 133:5–18 (Carpenter Test.)).

Gregoris is familiar with detailed, national information regarding Synthes's customer pricing strategies and matrices due in part to his role in contract negotiations with customers.  (Hrg. Tr. 1, at 30:4–31:9 (Gregoris Test.); Hrg. Tr. 2S, at 18:23–19:18 (Carpenter Test.) (sealed).)  AVPs have historically been directly involved in contract negotiations which implicate pricing information about hospital networks and systems beyond their assigned area.  (Hrg. Tr. 2S, at 23:16–25 (Carpenter Test.) (sealed).)  Specifically, groups of hospitals known as IDNs (Integrated Delivery Networks) and GPOs (Group Purchasing Organizations) receive uniform pricing across multiple regions and areas; AVPs are responsible for gathering information from their peers "around the pricing strategy corridors, [Synthes's] opportunity, [its] strengths and weaknesses there, and putting together the strategy to put forward the complete proposal for that grouping of hospitals."  (Hrg. Tr. 2S, at 23:16–24:10 (Carpenter Test.) (sealed).)  Carpenter testified that because Synthes has a national pricing strategy, knowledge of the pricing matrix and details of contracts in one area can be used advantageously anywhere in the country.  (Hrg. Tr. 2S, at 24:6–9 (Carpenter Test.) (sealed).)

As mentioned above, Gregoris was also responsible for the nationwide integration of BME, which is focused on extremity products for the foot, ankle, hand and wrist areas.  (Hrg. Tr. 2S, at 47:12–48:11 (Carpenter Test.) (sealed); Verified Compl. ¶ 72.)  In that role, he learned strategic information and plans related to one of the fastest growing areas of the business and one in which Globus intends to compete with Synthes with its initial set of products.  (Verified Compl. ¶¶ 73, 77); *see also* (Hrg. Tr. 2S, at 46:24–47:11, 51:5–15 (Carpenter Test.) (sealed); Pl.'s Exs. 20, 42)).  Gregoris received BME sales histories for 2015 and 2016, broken down by facility, affiliation, product type and quantity.  (Hrg. Tr. 1, at 118:21–119:14 (Gregoris Test.); Pl.'s Ex. 42.)  In an email disseminating this information, Gregoris wrote that all personnel with access to it should have non-disclosure and non-compete agreements, as "this type of sales information is a playbook for a competitor," (Pl.'s Ex. 181 (sealed); Hrg. Tr. 1, at 119:15–120:9 (Gregoris Test.)), and Carpenter confirmed that this information would enable a competitor to identify and target customers who already use these kinds of products, (Hrg. Tr. 2S, at 48:13–21 (Carpenter Test.) (sealed)).

*      *      *

Gregoris received and worked with  confidential Synthes information regarding the company's national business strategy during the same period of time he was meeting with Globus executives, aggressively negotiating all aspects of his new position at Globus and making the necessary arrangements for his resignation from Synthes.  For example, he had access to Synthes's business planning information, including information for the trauma division's 2017 strategic plan.  (Verified Compl. ¶ 54.)  During the two-day President's Meeting Gregoris attended in September 2016—after he had already met with Globus representatives several times and received an offer for the Globus position—each AVP presented a business plan for his area

22

and the team discussed, reviewed and analyzed those plans with a view toward synthesizing a business plan for the country.  (Hrg. Tr. 2S, 49:4–22 (Carpenter Test.) (sealed); Verified Compl. ¶ 55.)  The AVPs spent many hours across several days reviewing these presentations and plans.  *See* (Hrg. Tr. 2S, 49:4–22).  The presentations were confidential and shared only with Synthes's top executives and sales leadership team.  (Verified Compl.  ¶ 60.)

For that meeting, each AVP was tasked with focusing on six strategic priorities involving cross-selling opportunities across Synthes's portfolio, staffing and personnel strategies, operational strategies to improve payment processes and contracting and pricing strategies to drive growth.   (Hrg. Tr. 2, at 48:22–50:25 (Carpenter Test.); Verified Compl. ¶ 57.)  They identified specific plans, with reference to specific accounts and personnel, for executing their goals.  (Pl.'s Exs. 47–48, 52 (sealed); Verified Compl. ¶ 56.)  Gregoris presented on these topics to his fellow AVPs and Synthes executives and later received each of the AVPs' presentations in PowerPoint form.  (Pl.'s Exs. 47, 48 & 52.)  After the meeting, Gregoris sent an email to his team detailing strategic priorities for the rest of September and included "notes and action items" based on discussions at the meeting.  (Pl.'s Ex. 50 (sealed).)

Gregoris also received a slide deck covering the range of nationally relevant confidential information that was presented and discussed at the President's Meeting.  Those slides detail Synthes's nationwide business with specific strategic initiatives, top accounts, expiring contract assessments, growth assessments, local market insights and trends.  (Pl.'s Ex. 53 (sealed); Verified Compl. ¶¶ 61–63.)  Synthes has a nuanced and confidential manner of classifying customers and has developed corresponding pricing matrices and special pricing arrangements.  (Pl.'s Ex. 53 (sealed).)  The slides Gregoris received contained information about every customer's classification and the decided-upon pricing arrangement for each.  (*Id.*; Hrg.

Tr. 2S, at 19:22–20:24, 22:4–7 (Carpenter Test.) (sealed).)  Gregoris also received confidential

information regarding Synthes's customer rewards programs and salesforce strategies.  In order

to adapt its sales strategy to the changing healthcare market, Synthes has developed methods of

delivering services and customer rewards models, featuring rebate programs and reward program

"solutions."  Gregoris regularly received detailed nationwide information about each customer's

eligibility for rebates, receipt of rewards and status in Synthes's reward program.  (Hrg. Tr. 2S,

at 33:11–34:7 (Carpenter Test.) (sealed); Pl.'s Ex. 83 (sealed).)

     On August 2, 2016 Gregoris requested and received the "Strategic Customer Group

Solutions Playbook," which details seventeen reward program solutions as well as Synthes's

confidential system of classification, pursuant to which different combinations of solutions are

offered to customers.  (Pl.'s Ex. 45 (sealed).)  Carpenter testified that the playbook contains the

"complete strategy around how to interface with every customer in the country, including . . . our

sets, how the sets are configur[ed], the optimization of those sets," "the organizational chart or

the folks that you need to speak with," details about the supply chain, "which was a significant

problem for hospitals around the country," and very specific solutions Synthes provides to help

customers increase efficiency, cut costs and improve patient care.  (Hrg. Tr. 2S, at 25:9–22

(Carpenter Test.) (sealed).)  According to Carpenter, someone familiar with these strategies

would "know exactly which customers to go to, . . . what [Synthes's] pricing corridors

are, . . . what price points to be at, . . . [and] what solutions [Synthes] was offering" its

customers.  (*Id.* at 27:11–23.)  The leadership team also shares and discusses "strategies around

optimization of their sales force, cross selling and various other confidential projects."  (Hrg. Tr.

2, at 134:7–20 (Carpenter Test.).)  For example, on September 28, 2016 Gregoris participated in

a call in which AVPs discussed plans to redefine Synthes's nationwide revenue model, (Verified Compl. ¶¶ 65 & 66), and received a slide deck outlining the strategy, (*id.* ¶ 67).

As an AVP, Gregoris was also directly involved in several projects relating to the development of Synthes's commercial strategy and potential changes to its distribution structure. These discussions were confidential, and Gregoris was required to sign separate non-disclosure agreements to participate. *See* (Hrg. Tr. 1, at 133:7–20 (Gregoris Test.); Pl.'s Ex. 43, Ex. 84 (sealed)). For one project, Gregoris was given information about a physician's concept for a potential new product and asked for his thoughts on whether acquiring that product would further Synthes's commercial strategy. (Hrg. Tr. 1, at 133:7–20 (Gregoris Test.); Pl.'s Ex. 43.) For another, relating to very sensitive potential changes to Synthes's business model and distribution structure, Gregoris was one of a few people appointed to the team heading up the project. *See* (Pl.'s Ex. 43, Ex. 84 (sealed)).

Beyond commercial strategy, the senior leadership team regularly shares information about products in development. (Hrg. Tr. 2, at 134:1–135:4 (Carpenter Test.).) In those discussions, the team examines unreleased products that will "strategically fill portfolio gaps, where [Synthes's competitors] may now be playing and competing in that space effectively." (Hrg. Tr. 2S, at 45:13–23 (Carpenter Test.) (sealed).) For example, Gregoris participated in a call on June 9, 2016 in which the AVPs received and discussed detailed slides about various trauma products in development, including eight new hip, knee, or platform products and eight new extremities products. *See* (Pl.'s Ex. 44 (sealed)).

Finally, certain of Gregoris's activities at Synthes involved confidential information from an array of different areas of the business. For example, in October 2016, while in the final stages of his negotiations with Globus, Gregoris underwent "red carpet training," which included

25

overviews of market trends, the competitive landscape, Synthes's performance, portfolio overviews and Synthes's key strategic priorities for the next eighteen to twenty-four months, including those relevant to the rollout of a confidential new product.  (Pl.'s Ex. 55 (sealed).)  The training also featured comparisons between Synthes's products and competitors' products, highlighting key design features intended to make Synthes's products superior.  (Pl.'s Ex. 59 (sealed).).  Those in attendance saw a presentation detailing the key design features and technologies behind a new product.  (*Id.*)  Gregoris headed the launch of that new product and was involved in meetings regarding another confidential product that has not yet hit the market; (Hrg. Tr. 1, at 52:23–54:10 (Gregoris Test.)), he was also privy to details about future iterations of that product which are still in development.  *See* (Hrg. Tr. 2S, at 46:22–47:11 (Carpenter Test.) (sealed)).

The evidence shows that through his position as a Synthes AVP Gregoris was, for a period of several years, privy to an extensive amount of confidential information pertaining not merely to his immediate area of responsibility in the northeast, but to Synthes's nationwide operations.  Much like the defendant in *Strom*, Gregoris seeks to minimize or even trivialize his job duties to downplay the competitive importance of the information he received as an AVP.  *See Strom*, 621 F. Supp. 2d at 212–13.  As in *Strom*, however, it is clear that Gregoris "was exposed to a considerable amount of highly sensitive competitive information that is entitled to protection under New Jersey law."  *Id.*

**2.**

Gregoris contends that he has not disclosed or provided to Globus any confidential Synthes information and that he will not do so in his new role at Globus.  *See* (Hrg. Tr. 1, at 242:9–244:25 (Gregoris Test.).)  Even if Gregoris never does "disclose" Synthes's confidential

information, the restrictive covenant bars not only the disclosure, but also the use, of that information.  Such use of at least some of the confidential information Gregoris learned at Synthes is virtually inevitable, given how much of the information will be relevant—if not outright essential—to effectively performing the role of vice president of sales for Globus's trauma division.

There is direct competitive overlap between some of Gregoris's duties at Synthes and his future tasks at Globus.  Notably, Gregoris was privy to the details of Synthes's long-term plan for streamlining and optimizing the trauma division's product portfolio, as well as information about which product lines were profitable and which were not.  (Hrg. Tr. 1, at 113:2–15, 115:9–15 (Gregoris Test.); Pl.'s Ex. 170; Verified Compl. ¶ 69.)  He knows about various products in development and the specific design features that make them clinically superior to products currently on the market.  Carpenter testified that Globus could use this knowledge to "start making tweaks to their product, their portfolio, and making adjustments now rather than after we come to market."  (Hrg. Tr. 2S, at 46:22–47:11 (Carpenter Test.) (sealed).)  Gregoris also regularly received information regarding Synthes's strategies for configuring and pricing its surgical sets.

All of this information would advantage Globus, which Globus Group President of Emerging Technologies David Demski noted is still in the process of product development and finalizing its product portfolio.  (Hrg. Tr. 3, at 13:6–8 (Demski Test.).)  Demski acknowledged that Gregoris will be involved in that process—"giving some input into fine-tuning our product development, the number of set configurations that we have, [and] the number of different sizes of screws and rods that you would put in a set."  (*Id.* at 26:26–27:3.)  Unsurprisingly, the specific products Globus is developing are technically and functionally similar to some of the products

sold by Synthes.  *See* (Hrg. Tr. 1, at 34:3–36:9 (Gregoris Test.)).  Because Gregoris will be directly involved in optimizing Globus's portfolio of trauma offerings—an area he knows well from the confidential information he received while at Synthes—it would be virtually impossible for him to perform his new duties without disclosing, or at a minimum using or relying on Synthes's confidential information.

Gregoris will be expected to develop nationwide sales strategies at Globus.  At Synthes, he was privy to Synthes's confidential plan to reduce sales costs by geographically optimizing the sales force.  (Pl.'s Ex. 54 (sealed).)  According to Carpenter, this information "involves those relationships that are critical to [Synthes's] business, and anyone else that wants to get into the trauma business."  (Hrg. Tr. 2S, at 42:14–20 (Carpenter Test.) (sealed).)  Moreover, at least some of this information came in the waning days of his employment with Globus—in October 2016 for example, Gregoris received slides describing Synthes's plan with instructions to alter his salesforce deployment accordingly.  (Pl.'s Ex. 54 (sealed).)  It is difficult to imagine that Gregoris could completely disregard what he learned at Synthes while developing a salesforce and strategy for Globus's nascent trauma division.

Carpenter further explained how Gregoris's knowledge of confidential Synthes information would be directly relevant to his other responsibilities for Globus.  With respect to developing commercial strategies, Carpenter testified that Gregoris knows and has been involved in all of Synthes's go-to-market strategies and "could play the gaps if he wanted to[,] or he could copy and emulate the strategy on a national basis."  (Hrg. Tr. 2S, at 59:20–24 (Carpenter Test.) (sealed).)  With respect to hiring a sales team, Gregoris knows exactly how Synthes compensates its employees as well as "insights to which sales teams and sales members are performing and which ones aren't performing even at the regional level across the country."  (*Id.* at 60:2–

6.) Gregoris will also be responsible for developing compensation plans at Globus; he knows the details of Synthes's plans for compensating trauma sales employees as well as its BME compensation plan, its cross-selling compensation plan and its distributor compensation plan.  (*Id.* at 60:11–16.)

Gregoris will also help determine pricing and product positioning strategy at Globus. (Def.'s Ex. 25, at 3.)  Carpenter stated that in their regular calls "and with every product [Synthes has] ever launched we have a value dossier that talks about how we're positioning that product in the marketplace, the competition, the price points, how many sets, the quantity, the configuration of those sets."  (Hrg. Tr. 2S, at 61:7–14 (Carpenter Test.) (sealed).)  As a result, Gregoris "doesn't have to reinvent the wheel.  He doesn't have to come up with a new strategy.  He knows those strategies."  (*Id.*)  The same can be said of developing training programs for Globus's fledgling salesforce.  Gregoris has "strong in-depth knowledge" of Synthes's training, toward which the company has invested roughly half a million dollars per person over time.  (*Id.* at 62:16–63:9.)  A competitor armed with this array of strategic information could be very disruptive with customers.  (*Id.* at 21:6–21.)  Carpenter testified that Gregoris, with knowledge of Synthes's customer classification system as well as "the amount of opportunity that's at every one of those hospitals, their pricing for all the products within those hospitals, and then their discounting corridors," could use that information to "offer a lower price that we're willing or able to commit to that customer to potentially sway the customer from DePuy Synthes."  (*Id.*)

Gregoris well understood that his experience with confidential information pertaining to Synthes's nationwide strategies and operations would help him get the Globus vice president job. Using the Globus job description as a template, (Def.'s Ex. 25), he created a list of his relevant experiences at Synthes, (Pl.'s Ex. 24), to demonstrate his qualifications to perform the essential

functions of the Globus position, *see* (Hrg. Tr. 1, 125:4–18).  Gregoris created the list to

"promote" and "help to sell [him]self" to the people at Globus in the interview process—indeed

Gregoris acknowledged that he created the document so that when he went to an interview he

could position himself as "the top candidate."  (*Id.* at 122:5–5, 125:10–15, 128:24–129:3.)  On

that document, under a bullet point specifying that the Globus VP would be expected to develop

sales compensation plans with incentive plans to drive sales and long-term profitability, Gregoris

wrote "[d]one multiple times as AVP" and then listed various confidential Synthes compensation

plans with which he is intimately familiar.  (Pl.'s Ex. 24); *see* (Hrg. Tr. 1, 127:3–128:17; 129:4–

11 (Gregoris Test.)).  Under a heading titled "determining product pricing and positioning

strategy," Gregoris wrote: "[d]one many times for various products in DPS portfolio."  (Pl.'s Ex.

24.)  Under another heading, titled "bringing to bear exceptional [Key Opinion Leaders],"

Gregoris noted his "extensive rolodex and relationships."  *Id.*  Moreover, in a thank-you email

sent to Demski and Globus founder and CEO David Paul following his initial interview,

Gregoris wrote of his time at Synthes, "I have had the privilege of developing the most

significant relationships with top professionals, surgeons and hospital personnel *throughout the*

*US* and some global markets."  (Pl's Ex. 123 (emphasis added) (sealed).)

     In sum, Gregoris had access to an extensive amount of confidential information regarding

Synthes's national strategies and operations and was personally involved in various high-level

projects of national scale.  Allowing Gregoris to lead the sales efforts for Globus's new trauma

division as long as he does not do so in the "northeast area" of the country is no solution; Globus

cannot simply "carve him out" of that region and ensure that Gregoris will not violate the

restrictive covenant.  There are far too many similarities between his prior positions at Synthes

and what he learned in those roles, and his proposed job at Globus, and what he will be expected

to do in that position.  Even if Gregoris is somehow able to fulfill all his responsibilities to

Globus without disclosing confidential information, he will surely *use* that information in doing

so.

## C.

While Synthes has shown a likelihood of success on the merits, it must also show that a

breach by Gregoris will result in irreparable harm.  The mere risk of irreparable harm is

insufficient.  Rather, Synthes "has the burden of proving 'a clear showing of immediate

irreparable injury.'"  *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992)

(quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)).  An injury is irreparable

when it "cannot be redressed by a legal or an equitable remedy following a trial; a preliminary

injunction must be the *only* way of protecting the plaintiff from harm."  *Instant Air Freight Co. v.*

*C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (emphasis added); *ECRI*, 809 F.2d at

226 ("[T]he requisite feared injury or harm must be irreparable . . . and it must be of a peculiar

nature, so that compensation in money cannot atone for it." (quotations omitted)).

Any irreparable harm must be imminent.  *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614

F.2d 351, 359 (3d Cir. 1980) ("The requisite for injunctive relief has been characterized as

a  clear showing of *immediate* irreparable injury or a presently existing actual threat."  (emphasis

added) (internal quotations omitted); s*ee also, e.g.*, *StrikeForce Techs., Inc. v. WhiteSky, Inc.*,

No. 13-1895, 2013 WL 2658859, at *5 (D.N.J. June 11, 2013) (declining to issue preliminary

injunction where plaintiff failed to make "a clear demonstration" of the imminent threat of

disclosure or confidential information).

This demands a fact-specific inquiry.  *See, e.g.*, *Laidlaw, Inc. v. Student Transp. of Am.,*

*Inc.*, 20 F. Supp. 2d 727, 766–67 (D.N.J. 1998) ("[I]rreparable harm is not automatically

presumed from a finding that Plaintiffs have a likelihood of success on the merits; rather, the

Court must still make a careful examination of the particular facts.").  As with the question

whether a breach will occur, the risk of immediate irreparable harm depends in part on

Gregoris's previous duties with Synthes and his future duties with Globus.  *E.R. Squibb & Sons,*

*Inv. v. Hollister, Inc.* No. 91-203, 1991 WL 15296, at \*10 (D.N.J. Feb. 5, 1991) ("[T]he position

of the employee is an important factor in determining whether the risk of disclosure is

sufficiently imminent to justify a preliminary injunction."); *see also Cont'l Grp.*, 614 F.2d at 358

n.13 (noting that the "risk of a design engineer's disclosure of manufacturing secrets does not

establish an equivalent risk for a plant manager.").

     Disclosure of confidential information can support a finding of irreparable

harm.  *Laidlaw*, 20 F. Supp. at 766 (citing *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244,

1258–59 (3d Cir. 1985)).  Courts typically find immediate irreparable harm from a potential

disclosure based on two possibilities: First, through evidence that the former employee has the

intent to use that confidential information for the competitor's advantage.  *Compare, e.g.*,

*Appleby Sys. v. Caradon Thermal-Gard*, 1995 U.S. Dist. LEXIS 21709, at \*15 (M.D. Pa. Mar

27, 1991) (noting that "that the threatened release of a customer list constitutes irreparable harm

but also that the defendant in that case "unequivocally expressed its intention to make

[plaintiff's] customer list immediately available to its new distributors"), *with Cont'l Grp.*, 614

F.2d at 359 (noting that an injunction will not "be issued to restrain one from doing what he is

not attempting and does not intend to do" (quotations omitted)), *and E.R. Squibb*, 1991 WL

15296 (finding no irreparable harm where plaintiff did not demonstrate that the former employee

intended to disclose confidential information and the new employer adopted adequate safeguards

to protect against inadvertent disclosure).  Second, when the former employee was either

responsible for generating the confidential information or has an in-depth familiarity with it and will be in a position to use that information with the new employer. *Cf., e.g.*, *E.R. Squibb*, 1991 WL 15296, at *8 (finding no risk of irreparable harm where new employer took measures to prevent disclosure of employee's known confidential information).

Gregoris asserts that he does not intend to use any of Synthes's confidential information at Globus.   Despite Gregoris's assurances, his duties at Globus will clearly require him to rely, at least to some extent, on that information.   The confidential information Gregoris absorbed over many years in a high-ranking position at Synthes will undoubtedly disadvantage Synthes or advantage Globus if Gregoris is allowed to promptly being his work as vice president of sales in Globus's trauma division.   This is evident not only from the substantial overlap between Gregoris's duties at Synthes and his future tasks at Globus, *see supra* Section IV.B, but also from the fact that Gregoris will be able to use much of that information even before Globus's trauma products receive FDA approval.   For example, Gregoris was tasked with providing feedback regarding Synthes's confidential strategies for portfolio optimization, (Hrg. Tr. 1, 113:2–22 (Gregoris Test.)); (Pl.'s Ex. 170 (sealed)), and Demski testified that Gregoris will participate in portfolio optimization and have input into product development at Globus.   (Hrg. Tr. 3, at 267:26–27:3 (Demski Test.).)   Even if Gregoris does not disclose any confidential information he learned about these aspects of Synthes's business, it strains credulity to think that he will be able to perform these tasks and make strategic recommendations without relying on it.   *See Angelini*, 2016 U.S. Dist. Lexis 138085, at *20 ("As to the risk of disclosure, it defies logic to think that Angelini would assume the role as President of Baxter's Biosurgery Division and not disclose *or rely upon* confidential information learned in her employment with the Plaintiffs, notwithstanding Angelini's testimony to the contrary." (emphasis added)).   The harm from such

use will be immediate—before the FDA approves any of Globus's proposed trauma products.

Gregoris can begin strategizing for Globus immediately.  His regular and frequent exposure to

extensive confidential Synthes information, his responsibility for knowing that information, and

his future duties at Globus demonstrates Synthes will suffer imminent irreparable harm if

Gregoris is not enjoined.

*       *       *

According to Demski, even if Gregoris enjoys a so-called "eureka moment"[3] in which

Synthes's confidential information came "flooding back to him," Gregoris would be unable to

put any of that information to use to Globus's advantage or Synthes's detriment.  Demski

asserted that Gregoris's knowledge of Synthes's national and regional pricing strategies, rebate

and bundling strategies, compensation plans, rankings of sales consultants, expiring contracts,

proportion of trauma spending at given hospitals, inventory optimization schemes and set sales

would, for various reasons, not help Globus.  *See* (*id.* at 28:4–34:9 (Demski Test.)).

Carpenter more credibly explained that this is unlikely to be the case in a number of

areas.  Unlike Demski, Carpenter is entirely aware of the extent (and value) of the information

Gregoris received while at Synthes.  *Compare* (*id.* at 41:4–8 (Demski Test.)), *with* (Hrg. Tr. 2, at

128:17–129:25 (Carpenter Test.)), *and* (Hrg. Tr. 2S, at 37:18–38:2 (Carpenter Test.)

(sealed)).  Carpenter illustrated precisely how, using this information, Gregoris could

immediately advantage Globus or disadvantage Synthes.  He explained, for example, that the

nationwide rankings of sales consultants and regional managers Gregoris received "is powerful

[information], and could be used to advantage a competitor."  (Hrg. Tr. 2, at 135:9–16 (Carpenter

---

[3]     The *Angelini* court noted that although the defendant-employee testified that "she does not remember the details of the discussions, slides, and the Workshop, [that] does not mean her memory is inoculated from a sudden eureka! moment, wherein all of her former employers' confidential business secrets come flooding back."  *Ethicon, Inc. v. Angelini*, 2016 U.S. Dist. LEXIS 138085, at *18 (M.D. Fla. Sept. 22, 2016).

Test.).)  Specifically, information identifying the best- and worst-performing sales consultants, could be used both to "recruit our top performers, our best and brightest that have strong relationships around the country" and to gain "some sort of understanding of who may be weak and not have those relationships where there's an opportunity to capitalize on that."  (Hrg. Tr. 2S, at 37:21–38:13 (Carpenter Test.) (sealed).)  Gregoris will be responsible for developing a national strategy at Globus.  (Def.'s Ex. 25, at 2–3.)  Demski's assertion that Synthes is less concerned with top performers than with recruiting those who fit within their corporate culture overlooks the fact that knowledge of where Synthes over or underperforms will allow Gregoris to immediately tailor a sales strategy precisely to undercut Synthes in their weakest markets.

Demski also testified that Gregoris "suddenly recalling" Synthes's rebate or bundling programs would not benefit Globus because "bundling is not really part of our strategy or even an opportunity for us at this point," as Globus does not have the full extent of divisions Synthes has, such as maxillofacial, power tools and sports medicine.  (Hrg. Tr. 3, at 30:5–11 (Demski Test.).)  This disregards that Gregoris could nevertheless impart the lessons from bundling at Synthes to bundling with the only other division Globus does have (spine) to bolster sales in trauma.  (Hrg. Tr. 2S, at 60:19–61:6 (Carpenter Test.) (sealed).)  Moreover, Demski did not address Gregoris's knowledge of Synthes's rebate programs, which would allow Globus to tailor its pitch to hospitals to undercut Synthes in this area.  *See* (Hrg. Tr. 3, at 30:4–31:9 (Demski Test.)).

Demski further stated that any information Gregoris has regarding inventory optimization would be of no use to Globus.  He testified that optimizing inventory will not be a priority for Globus, as the company will instead focus on developing *enough* inventory to satisfy demand.  (*Id.* at 34:12–23.)  It is highly improbable that even a relative upstart would be

unconcerned with efficiency; it is even less probable that Gregoris would be able to disregard any lessons learned from his knowledge of Synthes's inventory optimization.  Even if inventory optimization is not a *priority* for Globus, Gregoris's knowledge in this area puts him in a position to immediately advantage Synthes or disadvantage Globus through his use of confidential information.

Demski testified similarly regarding pricing information, stating that because Globus's trauma division is in its infancy, its customers will dictate prices to it.  (*Id.* at 29:5–15.)  This ignores that where Globus can satisfy customers' price demands, it can also undercut Synthes's prices.  Moreover, the Globus job description lists "determin[ing] product pricing and positioning strategy" as one of the essential functions of the position.  (Def.'s Ex. 25.)  As Carpenter noted regarding Synthes's pricing and positioning strategy, Gregoris "doesn't have to reinvent the wheel.  He doesn't have to come up with a new strategy.  He knows those strategies."  (Hrg. Tr. 2S, at 61:7–14 (Carpenter Test.) (sealed).)

Finally, Demski dismissed the notion that a "eureka moment" regarding set sales would benefit Globus.  He noted that "the selling of sets is uncommon at this point.  Ten years ago it was common to sell the entire set, but the industry has shifted to consignment, so all of the providers make the set available for use, and then the customer only pays for the implants that are used."  (Hrg. Tr. 3, at 34:5–9 (Desmki Test.).)  This overlooks two important points.  First, Desmki himself noted that one of Gregoris's duties at Globus will be "fine-tuning" set configurations.  (*Id.* at 27:1–7.)  Regardless of whether the items within those sets are consigned or sold, the confidential set-design information Gregoris received at Synthes will be valuable in "fine-tuning" Globus's set configurations.  Second, Carpenter explained that the information AVPs regularly receive about set sales and pricing indicates, among other things, which

customers are still willing to acquire sets.  That information would tell a competitor where it could go to sell this kind of equipment in an environment where many customers have switched to a full consignment model.  (Hrg. Tr. 2S, at 58:24–59:5 (Carpenter Test.) (sealed).)

*     *     *

Neither Gregoris nor Globus have agreed upon or put in place adequate safeguards to prevent Gregoris's use or disclosure of confidential Synthes information should Gregoris assume his high-ranking position with Globus.   When asked how Globus intended to eliminate these risks, Demski testified that:

> Dan reports to me, so I will be aware of his activities, and he's based out of our headquarters, so I'll see him regularly.  So I don't think Dan would violate them, from just getting to know him, but if there's any question, he'll deal with me and our legal team on that.

(Hrg. Tr. 3, at 27:16–20 (Demski Test.).)  This is no check on potential use or disclosure—even inadvertent disclosure—at all.  It is surely insufficient to overcome the significant concerns over disclosure in this case.  *Cf., e.g.*, *E.R. Squibb*, 1991 WL 15296, at *2 (noting a new employer's review program aimed at preventing employee from disclosing competitor's confidential information).

The imminent risk that Gregoris will advantage Globus or disadvantage Synthes in his new position is heightened by Gregoris's demonstrably casual interpretation of what constitutes confidential information.  To Gregoris, the most important safeguard against his use or disclosure of confidential information is that he never copied, retained, or transmitted any of Synthes's confidential information, (Hrg. Tr. 1, at 211:3–212:9 (Gregoris Test.)), that he does not intend to do so and that no one can question his integrity.  To be sure, Carpenter testified that he considered Gregoris to be a person of the highest integrity.  (Hrg. Tr. 2, at 173:12–14 (Carpenter Test.).)  The dispositive issue is not, however, whether Gregoris is a person of

integrity; the issue is whether there is an imminent risk that Gregoris will use or disclose Synthes's confidential information while at Globus.  *See Cont'l Grp.*, 614 F.2d at 359.  The hearing made clear that there is.

During the hearing, Gregoris often quibbled with whether information was confidential, even where there was no dispute it had been labelled and treated as such.  For example, he was asked about Synthes field-sales team rankings he received in December 2015.  (*Id.* at 100:1–9.) That document contains sales rankings for each Synthes trauma territory and shows, *inter alia*, sales and growth against quota.  (Pl.'s Ex. 33 (sealed).)  Gregoris did not think it would matter if a competitor learned this information because he did not think a competitor's knowledge of this information would "be damaging" to Synthes.  (*Id.* at 102:13–20.)  Gregoris said as much even though he acknowledged that the rankings constituted confidential Synthes information.  (*Id.* at 103:4–6.)  Gregoris also received a year-to-date report on set sales on March 16, 2016, (*id.* at 109:16–24), which contained "tracking reports" on sales from every region in the country, including pricing information, (*id.* at 110:1–5).  Gregoris acknowledged that the report was confidential to Synthes, and not something he would share with a competitor.  (*Id.* at 110:6–9.) Nevertheless, he stated that the amount of set sales and their value to Synthes was not "extremely important" information, even though others may think it is.  (*Id.* at 112:1–9.)

When asked about a particular Synthes product pending FDA approval at the time of the hearing, Gregoris acknowledged that FDA submissions are confidential.  (*Id.* at 53:24–54:1.)  He added, however, that he did not consider what he knew about the product to be "very confidential" because "the competitors probably already know."  (*Id.* at 54:1–20).  Gregoris also received information pertaining to a confidential portfolio optimization project at Synthes.  (*Id.* at 112:22–113:5; Pl.'s Ex. 170 (sealed).)  The materials he received included lists of accounts

with their sales and revenue information and the sales that would be affected by the project. (Hrg. Tr. 1, at 113:16–21 (Gregoris Test.).)  The project was a five-year plan to discontinue certain product lines, (*id.* at 115:9–15), that Gregoris thought, but did not know, were disclosed to customers, (*id.* at 115:20–25).  Gregoris was also involved in a highly confidential project concerning a physician's concept for a new product.  In fact, the project was so sensitive that Synthes required Gregoris to sign a non-disclosure agreement governing his participation.  Yet Gregoris downplayed his involvement in the project, stating that he "didn't find it to be that confidential at all."  (*Id.* at 133:7–134:6.)

Gregoris received an e-mail attachment containing the company's Strategic Customer Group Solutions Playbook.  *See* (Pl.'s Ex. 45).  The attachment was designated for internal training purposes and "not for use with customers or for distribution."  (Hrg. Tr. 1, at 157:115 (Gregoris Test.).)  The document contains information about a strategy Synthes was planning to execute with customers as part of contract and pricing arrangements.  (*Id.* at 159:6–9.)  Despite this, Gregoris claimed he does not "know how confidential [the Playbook] is."  (*Id.* at 157:1–15.)

Gregoris's own testimony highlights the imminent risk of his disclosure or use of Synthes's confidential information.  Gregoris will naturally feel free—as any person would—to disclose or use material he does not believe rises to the level of confidential information. "Confidential information," however, is defined in the Agreement, *see* (Pl.'s Ex. 5, at 1), and Gregoris is not the arbiter of which aspects of Synthes's business are or are not "generally known to the trade or industry."

### D.

Synthes must prove that the balance of equities tips in its favor.  *See Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205 (3d Cir. 2014).  "A basic purpose behind the

balancing of the equities analysis is to ensure that the issuance of an injunction would not harm the [nonmovant] more than a denial would harm the movant." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321, 343 (D.N.J. 2002); *see also Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990).

Synthes faces immediate and irreparable injury should Gregoris assume the vice president of trauma sales position at Globus because Gregoris's duties at Globus will require him to use or disclose Synthes's confidential information. *See supra* Section IV.B. Moreover, if Gregoris is allowed to take this position at Globus, "there is no adequate method to determine a remedy, nor any assurance that [Gregoris] could ever compensate [Synthes] for the harm caused by h[is] disclosure of confidential information and h[is] employment with [Globus]." *Angelini*, 2016 U.S. Dist. LEXIS 138085, at *21.

In contrast, Gregoris's potential injury is readily calculable and comparably small. Gregoris knew the risks involved in taking this position at Globus, (Hrg. Tr. 2, at 50:9–10); he and his lawyer negotiated complete income protection from Globus for two years in the event he is enjoined, *see* (Pl.'s Ex. 28 (sealed)). Gregoris will be highly compensated for the eighteen-month restrictive period and for up to six months beyond that timeframe. Globus also agreed to fully indemnify Gregoris "for attorney's fees and litigation expenses in connection with the defense or settlement of any threatened, pending or completed civil action or suit, or appeal thereof . . . brought by DePuy Synthes." (Pl.'s Ex. 29 (sealed).) Moreover, Synthes has agreed to pay Gregoris his Synthes base salary for the duration of the restrictive covenant—an approximate value of $349,800—should Globus renege on its contractual obligations. *See* (Pl.'s Reply, at 2, ECF No. 16 (sealed); Hrg. Tr. 1, at 185:16–25 (Gregoris Test.); Hrg. Tr. 3, at 164:11–12 (Demski Test.)); *cf. also Angelini*, 2016 U.S. Dist. LEXIS 138085, at *21. Gregoris

contends that none of this matters because he is a fifty-year-old man who will, after collecting a significant salary from Globus for two years, be "back in the street" with a "black mark" from an injunction.  (Hrg. Tr. 1, at 248:2–249:9 (Gregoris Test.).)  He testified that an injunction will be "career derailing" because there is no guarantee that Globus will have a position for him after the expiration of his non-compete agreement.  (*Id.*)

Whatever harm may befall Gregoris if he is enjoined from starting work at Globus is insufficient to tip the balance in his favor.  For one, Gregoris agreed to the post-Synthes employment restrictions when he signed the Agreement, *see, e.g.*, *Strom*, 621 F. Supp. 2d at 230 (finding balance of the harms did not favor employee where employee was "well aware of the restrictions of the Agreement when he signed it"), and he knew from conversations with his attorney that there was a risk he would be enjoined when he left Synthes.  *See* (Hrg. Tr. 2, at 50:1–10 (Gregoris Test.); Hrg. Tr. 1, at 45:18–46:4 (Gregoris Test.)).  Furthermore, any financial harm to Gregoris is offset by the salary protection he and his lawyer negotiated with Globus, while Synthes's potential harm from lost confidential information to a competitor is incalculable.  *See also Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 480 (E.D. Pa. 2007) ("[T]he numerous courts that have specifically enforced non-compete covenants against the employee have concluded that, regardless of the relative wealth of the employer and employee, the harm to the employer trumps the harm to the employee.").  The balance of the harms in this case favors granting the injunction.

### E.

Synthes must also show that the public interest favors the issuance of the injunction.  "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the

plaintiff.  Nonetheless, district courts should award preliminary injunctive relief only upon weighing all four factors."  *Am. Tel. and Tel. Co. v. Winback and Conserve Prog., Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

Here, it is not clear that the public interest is implicated as the effects of this adjudication are largely limited to the private parties involved.  *See Cont'l Grp.*, 614 F.2d at 357 (holding that the public interest factor was not implicated in a non-compete case because the specific action at issue would not help or harm the public and the public interest factor is generally "considered within the confines of disputes involving governmental agencies or programs rather than in the adjudication of private controversies").  However, the Third Circuit Court of Appeals recently found an injunction to be in the public interest because "the public at large can be expected to gain from the enforcement of non-competes that make it possible for staffing agencies to continue performing their services for both employees and employers."  *HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 175 (3d Cir. 2015) (quoting *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1560 (11th Cir. 1983) (finding enforcement of non-compete agreement in public interest because it encourages companies to invest in the development and education of their employees)).

Similarly, in *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102 (3d Cir. 2010), the Third Circuit recognized a "generalized public interest in upholding the inviolability of trade secrets and enforceability of confidentiality agreements."  *Id.* at 119; *see also Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007) ("No important public policies readily appear to be implicated by the issuance of the preliminary injunction in this case other than the general public interest in the enforcement of voluntarily assumed contract obligations.").  The *Bimbo Bakeries* court also recognized a public interest in

"employers being free to hire whom they please and in employees being free to work for whom they please" and stated that employees' rights to employment mobility are generally significant but ultimately concluded that the public interest in preventing the misappropriation of the company's trade secrets outweighed the temporary restriction on the former employee's choice of employment. *See id.* The court's decision turned in large part on the character of the information involved—the former employee had accessed and acquired confidential information about the company's "long term strategies, operating costs, and customer negotiations." *Id.* at 113. Based on this, the court concluded that an extended analysis of the public interest was not necessary because extensive precedent supports an injunctive remedy where trade secrets of that character are involved. *Id.* at 119.

Here, Gregoris acquired far-reaching knowledge of, among other things, Synthes's national sales strategies, product development and portfolio optimization plans, pricing and performance information. In order to enable it to invest in the education of its employees while ensuring the protection of its confidential information, Synthes had Gregoris sign a non-compete agreement. Under *Cont'l Grp.*, the public interest is not implicated on these facts and will thus not be harmed by the issuance of an injunction. Under *Butts* and *Bimbo Bakeries*, the public interest favors the enforcement of the non-compete agreement. In any case, the public interest factor does not weigh against granting the injunction, and Synthes has thus carried its burden with respect to all four elements.

## V.

Federal Rule of Civil Procedure 65(c) states in relevant part that a preliminary injunction may only be granted "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

restrained."  Rule 65(c)'s instruction is mandatory, with only narrow exceptions.  *See Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988) ("Although the amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary."); *see also Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) (requiring a bond to be posted even where the party enjoined would "not suffer direct monetary harm if [an] Employment Agreement is enforced" because the employer "agreed to indemnify him for any loss of salary and legal expenses he may incur for the duration of the non-compete restriction").

The bond requirement's purpose is twofold.  For one, it serves to compensate a wrongfully enjoined party.  *Sprint Comm'cns Co. L.P. v. CAT Comm'cns Intern., Inc.*, 335 F3d 235, 241 n.5 (3d Cir. 2003) (citing *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910F.2d 1049, 1054 (2d Cir. 1990)).  It also serves to  "deter[] rash applications for interlocutory orders; the bond premium and the chance of liability on it cause plaintiff to think carefully beforehand." *Alexander v. Primerica Holdings, Inc.*, 811 F. Supp. 1025, 1034 (D.N.J. 1993) (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 804 (3d Cir. 1989)). "[T]he amount of the bond is left to the discretion of the court," *Franks GMC Truck Ctr*, 847 F.2d at 103, and proof of damages regarding the injunction bond "need not be to a mathematical certainty," *Latuszewski v. VALIC Fin. Advisors, Inc.*, 393 F. App'x 962, 966 (3d Cir. 2010). However, the bond amount cannot be purely speculative. *Latuszewski*, 393 F. App'x at 966 (citing 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2973 (2d ed. 2010)).

Synthes initially suggested a bond of $10,000 as adequate to cover the payment of any costs and damages that may be faced by Gregoris should he be wrongly enjoined.  (Pl.'s Mot., at

4.)  At the hearing, however, the company increased that amount to equal eighteen months of Gregoris's base salary at Synthes, a total of $349,800.  (Hrg. Tr. 3, at 114:10–17, 164:11–12.) Gregoris's counsel, meanwhile, argued that the bond should be greater than that amount, to cover the potential damages arising from the "career derailment" an injunction would cause.  (*Id.* at 154:11–25.)

If Gregoris is enjoined, he will be compensated by Globus in the amount of $475,000 per year for the first two years of his Globus employment.  (Pl.'s Ex. 28 (sealed).)  Given that Gregoris's total future compensation is likely to vary substantially[4] any attempt at calculating what he could potentially earn at Globus will be largely speculative.  Given the speculative nature of calculating either Gregoris's potential earnings at Globus or the damages arising from a "career derailment," the bond is set at $349,800, representing eighteen months of Gregoris's base salary at Synthes.  This amount is expected to cover any potential damages arising from error in granting the injunction, such as any benefits from Globus which Gregoris may go without, and deter rash applications for preliminary injunctions.  *See Alexander*, 811 F. Supp. at 1034.

An appropriate order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

---

[4]      Gregoris's Synthes salary varied substantially as a portion of his total compensation was based on bonuses. *See* (Pl.'s Ex. 11.)  His future compensation at Globus is similarly variable—it includes quarterly and annual performance bonuses based on individual and company performance.  (Pl.'s Ex. 28 (sealed).)  It also includes stock options that would vest at various times throughout his time at Globus and various other benefits, the value of which is unclear.  *See* (*id.* at 1–2).